## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                     )
MICHAEL JOHNSTON,                    )
                                     )
                    Plaintiff,       )
                                     )        Civil Action
v.                                   )        No. 19-10632-PBS
                                     )
HD SUPPLY CONSTRUCTION SUPPLY,       )
LTD. & WHITE CAP, INC.,              )
                                     )
                    Defendants.      )
_____)

### MEMORANDUM AND ORDER

SEPTEMBER 3, 2021

Saris, D.J.

### INTRODUCTION

Plaintiff Michael Johnston worked as a salesperson for H.D. Supply Construction Supply, Ltd. ("HD Supply") and White Cap, Inc. ("White Cap") (collectively, "Defendants"). He took three periods of medical leave from 2017 to 2018. Plaintiff claims that he suffered discrimination, retaliation, harassment, and a hostile work environment as a result of his disability and leave taking, and he brings claims under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 et seq.; the Family Medical Leave Act (FMLA), 29 U.S.C. §§ 2601 et seq.; and Massachusetts antidiscrimination law, Mass. Gen. Laws ch. 151B. Defendants have moved for summary judgment. For the reasons set forth below, the

Court **ALLOWS** in part and **DENIES** in part Defendants' motion (Dkt. 56).

## I.   BACKGROUND

Except where noted, the following facts are undisputed.

## I.   The Parties

### A.   Defendants

H.D. Supply is a construction supply business.  White Cap is a "spin-off" company from HD Supply.  At some point during his tenure with HD Supply, Plaintiff began working for White Cap.

David Via was the Vice President for the northeast region of HD Supply.  Jim Agis was the District Manager for HD Supply until June 2018, and Dennis Ford was Plaintiff's direct supervisor during that time.   In June 2018, Raph McNevin replaced Agis as the District Manager, and Brian Centofanti became Plaintiff's direct supervisor.

### B.   Plaintiff

Plaintiff began working as a salesperson for HD Supply in 2012.  In this role, he was paid a base salary, which was augmented through commissions.   His responsibilities included servicing customer accounts.

Plaintiff suffers from Crohn's disease.   Plaintiff attested that during flareups of the disease he experiences a range of debilitating symptoms, including "severe abdominal pain, increased frequency of bowel movements, joint pain, fever, fatigue, mouth

sores, vomiting, and weight loss." Dkt. 61-1 ¶ 4.  He further expressed that the flareups "significantly interfere with [his] ability to leave the house for prolonged periods of time, walk long distances, and even engage with [his] family." Id.

## II.   **2017 Leave Request**

In February 2017, Plaintiff requested both short-term disability leave and FMLA leave.  He remained on leave through May 2017.  During this leave period, District Manager Agis assigned other salespeople to cover Plaintiff's accounts.  Plaintiff received several letters from Liberty Mutual, the company responsible for managing leave requests for HD Supply, while on leave.  The letters instructed Plaintiff to contact his employer one week before his leave expired to schedule his return to work.

When Plaintiff returned to work, he fully retained all of his accounts except for Liberty Construction.  Liberty Construction requested that Plaintiff and another salesperson split the account going forward.  The parties dispute whether Liberty Construction made this request due to Plaintiff's deficient performance or growing demand for HD Supply's services.  Agis assigned Plaintiff other accounts upon Plaintiff's return to make up for the partial loss of the Liberty Construction account.

In May 2017, Plaintiff was issued a check for $12,913.24, which represented one month of Plaintiff's average commissions

prior to his short-term disability and FMLA leave.  This check was intended to help Plaintiff with his transition back to work.

### III. **2018 Leave Request**

Plaintiff requested short-term disability leave and FMLA leave again in May 2018.  In an affidavit, Plaintiff explained that he had been diagnosed with a painful tumor on his leg. Although Plaintiff had been successfully managing his Crohn's disease with regular injections of the drug Humira, in order to have the tumor removed, he would have to stop taking Humira for three weeks before and after the surgery.  Plaintiff asserts that stopping Humira causes an "almost immediate resurgence of [his] symptoms" and that he needed to take medical leave as a result. Dkt. 61-1 ¶ 11.

The leave request was approved.  As before, Plaintiff received letters from Liberty Mutual while on leave explaining that he needed to contact his employer one week prior to his return to work.  Plaintiff's accounts were once again temporarily reassigned during his leave period.  Upon his return from leave in July 2018, Plaintiff was placed in charge of all of his previous accounts except for Turner Brothers Construction, G&C Concrete, and Raycon Construction (which remained 50% his customer).  Plaintiff asserts that he was told that he would lose "several other[]" accounts at the time of his return.  At some point after Plaintiff lost the

above-listed accounts, he was assigned new accounts with Dimeo Construction, Callahan Construction, and Riley Brothers.

As a general practice, when a customer complains about an account manager, McNevin and Centofanti (the District Manager and Plaintiff's supervisor in 2018, respectively) would first ask the customer whether anything could be done to keep the current account manager assignment in place. McNevin and Centofanti followed this practice when representatives from Plaintiff's accounts complained.

## IV.   **The Reassigned Accounts**

Defendants have provided testimony from representatives of the reassigned accounts demonstrating concerns with Plaintiff's performance. The managing partner of Turner Brothers Construction testified that Plaintiff would commit to getting him materials by a certain date and then "not do it." Dkt. 57-4 at 13. He explained that Plaintiff's performance "caused a real issue for us" and "caused us a lot of pain." Id. He further explained that many of the complaints that he received from his staff about Plaintiff "was lack of availability." Id. at 16.

The managing partner could not recall whether Plaintiff's failure to obtain materials occurred during his medical leave. He did explain that he found out that Plaintiff was on medical leave only after "we just couldn't get ahold of him for the longest time." Dkt. 61-5 at 7–8. He also testified, however, that

Plaintiff "was kind of always choppy like that" and that "[h]e'd go in and out like that since when we first started working for him." Dkt. 57-4 at 16.  When HD Supply tried to keep Plaintiff on the Turner Brothers Construction account, Turner Brothers refused.

Similarly, at around the time of Plaintiff's return to work, G&C Concrete contacted Defendants to express concerns about Plaintiff's responsiveness to its requests.  The project manager for G&C Concrete explained that the temporary account manager who filled in during Plaintiff's leave was "doing really well and was very attentive" and that it was a "change . . . from what we were used to before."  Dkt. 57-5 at 12-13.  The project manager explained that Plaintiff was sometimes non-responsive, failing to call back when expected.  During one meeting, Defendants asked G&C Concrete if it would consider keeping Plaintiff on as account manager at 50% effort, but G&C declined, expressing a strong preference to continue working with Plaintiff's temporary replacement.

Finally, Raycon reached out to HD Supply to express concerns over how Plaintiff was handling its account.  In September 2018, Raycon sent Defendants an email stating that "in order for Raycon to continue our trade relationship with White Cap, we really need [Plaintiff's replacement] involved in partial or full capacity with our account."  Dkt. 57-32 at 7.

**V.**   **Testimony from Liberty Construction**

Plaintiff points to a sworn affidavit from a representative from another of his accounts, Liberty Construction, stating that Defendants informed him in June 2018 that Plaintiff might not return from his medical leave or would return at reduced capacity. More specifically, the Liberty Construction representative testified that, during a business meeting, Defendants expressed that Plaintiff "was experiencing serious medical issues, and would be on leave for an indefinite period of time." Dkt. 61-12 ¶ 5. According to the representative, Defendants went on to explain that Plaintiff's "chronic medical condition, the stress incurred in being an account manager was too much for him to handle and perform the job properly." Id. ¶ 6. Defendants further communicated that they were not sure if Plaintiff was ever planning to return to work and that, if he did return, he "will be put into a reduced role on the inside." Id. ¶ 7. Defendants then proceeded to introduce the representative to another account manager, referring to him as "the new Mike Johnston." Id. ¶ 8. Defendants do not dispute that this conversation happened but say that it was unauthorized.

## VI.  Plaintiff's Return to Work in 2018

Upon his return to work, Plaintiff was credited with sales made from July 19, 2018 to July 29, 2018. Some of the commissions during this period were from sales to Turner Brothers and G&C Concrete, whose accounts were no longer managed by Plaintiff.

Plaintiff was also given a check in the amount of $4,729.38 in order to assist him with his transition back to work.

Plaintiff encountered several obstacles after his return. For instance, Plaintiff took his company cellphone with him when he went on leave in 2018.  When Plaintiff returned to work on July 19, 2018, he discovered that he could not remember the passcode to his cellphone.  McNevin approved Plaintiff's request for a replacement phone, which was shipped to Plaintiff on July 31, 2018. Similarly, Plaintiff learned upon his return from leave that his company gas card had become inactive due to a lack of use.  McNevin informed Plaintiff that he should pay for gas and then expense it to the company until a new gas card was ordered and given to Plaintiff.

Finally, Defendants had begun using an expense system called "Concur" at some point during Plaintiff's tenure with the company. The Concur system required all required information in an expense form to be filled out completely or else it would be "kicked back" to the employee.  Dkt. 57-3 at 21.  After his return to work, one of Plaintiff's expense forms was returned to him by an HD Supply employee asking him to justify an expense.  Plaintiff asserts that this action constituted an audit of his expenses.

**VII.  Plaintiff's 2019 Leave**

Plaintiff went on leave again in April 2019.  At hearing, Plaintiff's counsel expressed that Plaintiff went on leave due to

psychological issues related to his Crohn's disease, which had flared up at the time.

While on leave, Plaintiff received multiple letters from Lincoln Financial Group (the new leave administrator for Defendants) explaining, among other things, that Plaintiff should contact his employer one week before his return to work or risk being terminated. On July 8, 2019, Plaintiff received a letter explaining that his FMLA leave was closed. Plaintiff received two letters on July 12, 2019 explaining that his leave had been extended through July 18, 2019 and that he must contact his employer one week prior to this date to discuss his return to work. On July 18, 2019, Plaintiff received a letter stating that his claim was closed and that he would need to contact his employer to return to work or he could be terminated for job abandonment.

Plaintiff asserts this his legal counsel had a meeting with Defendants on or around July 18, 2019 during which the parties agreed that Plaintiff would remain on FMLA or approved leave until further notice. In support of this assertion, he points to a July 23, 2018 email from his counsel to Defendants stating that "Mr. Johnston will remain on FMLA or approved leave until further notice." Dkt. 61-2 at 1. Defendants did not dispute this position in their reply to the email. On this basis, Plaintiff maintains that his FMLA leave still continues.

Defendants further assert that Plaintiff was required to provide a medical release form before he could return to work. The notice sent by Lincoln Financial stated that "[i]f your leave is due to your own medical condition, your employer may require that you present a release from your physician to work prior to being restored to employment."   Dkt. 57-13 at 2.   Plaintiff testified at deposition that he was ready to come back to work in February 2020, and an email dated March 9, 2020 from Plaintiff's attorney to Defendants stated that Plaintiff was prepared to work at least as of March 6, 2020.   Plaintiff submitted a return-to-work release on October 1, 2020; the release cleared Plaintiff to work on October 5, 2020—more than 17 months after Plaintiff went on leave.

Upon receipt of the medical release, Defendants offered Plaintiff a new position—Market Sales Specialist.   The position was the closest position to the account manager position, and Plaintiff was offered the highest possible base salary in the offer, although the position still represented a pay cut for Plaintiff.   No account manager positions were available in the region.   Plaintiff rejected the offer.

Defendants also considered putting Plaintiff in an alternative, "safety-focused role" that would come with a large salary and a bonus structure, as opposed to a small base salary

and commissions.  Dkt. 61-9 at 36.  They decided against offering Plaintiff this position, however.

## VIII.    Discussions of Plaintiff's Condition

Plaintiff claims that Defendants made light of or asked intrusive questions about his medical condition.  As an example, he points to an incident in February 2018 when Via, Vice President for the northeast region of HD Supply, insisted that Plaintiff watch a grotesque video.  Specifically, the video contained the following imagery:

> [S]omeone's fully exposed buttocks . . . [were] lowered from an apparatus hanging from the ceiling over a medical patient who was strapped to a gurney with restrains and whose eyes were held open with specula.  The patient screams in terror and struggles to escape, and the video culminates in a tense moment at which point the faceless person's anus expels flatus.

Dkt. 61 ¶ 6.  Via knew that Plaintiff has Crohn's disease.

Similarly, Plaintiff asserts that in July 2018, Centofanti "was present at Stars restaurant in Hingham, MA when Mr. McNevin was insulting with respect to his medical condition and talked to Johnston at length about the details of his 'cyst' removal, his Crohn's symptoms, and his recent medical ordeal."  Dkt. 61 ¶ 39. Defendants deny that Centofanti was aware of Plaintiff's specific health problems.

Finally, in handwritten notes dated from July 2018, Plaintiff documented that Via had asked Plaintiff detailed questions about his medical condition during a meeting.  The notes indicate that

Via asked the following questions, among others:  "What did you have wrong with you and why did it take so long to diagnose? How did the doctors find it?  Did it hurt?  What are the long term ramifications?  What tests did you have?"  Dkt. 61-13 at 3.

## IX.  <u>Charges before federal and state agencies</u>

Plaintiff filed charges before the Equal Employment Opportunity Commission ("EEOC") and the Massachusetts Commission Against Discrimination ("MCAD").  The charge before MCAD was dismissed without prejudice on March 8, 2019, and the EEOC issued a Notice of Right to sue on March 28, 2019.

## II.  <u>LEGAL STANDARD</u>

A party is entitled to summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[A]t summary judgment a court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the same."  <u>Chadwick v. WellPoint, Inc.</u>, 561 F.3d 38, 41 (1st Cir. 2009).  "A genuine issue exists when, based on the evidence, a reasonable jury could resolve the issue in favor of the non-moving party."  <u>Napier v. F/V DEESIE, Inc.</u>, 454 F.3d 61, 66 (1st Cir. 2006).

## I.  <u>Whether Plaintiff Is a Qualified Individual with a Disability under the Americans with Disabilities Act (ADA) or State Law</u>

Defendants argue that Plaintiff has not proven that he is a person with a disability as defined under the ADA or state law. See 42 U.S.C. § 12112 (preventing discrimination "against a qualified individual on the basis of disability"). Under the ADA, "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." Id. § 12102. "The Supreme Judicial Court of Massachusetts ("SJC") has indicated that federal case law construing the ADA should be followed in interpreting the Massachusetts disability law." Sensing v. Outback Steakhouse of Fla., LLC, 575 F.3d 145, 153–54 (1st Cir. 2009) (cleaned up).

Although Plaintiff does not cite to any medical records documenting his impairments, he attested in his affidavit that he had had severe Crohn's disease. And the record makes clear that Defendants repeatedly approved Plaintiff's leave requests, which shows that Defendants perceived Plaintiff as having an impairment that prevented him from working. Under the summary judgment standard, Plaintiff has provided sufficient evidence of a disability or handicap. Defendants' motion as to this issue is denied.

## II.  **Allegations or Claims Resulting from the 2017 Leave Period**

Defendants seek summary judgment on any claims by Plaintiff stemming from his leave in 2017. Plaintiff conceded at hearing

13

that he does not base any claims on actions by HD Supply or White
Cap employees resulting from his 2017 leave.  This concession is
consistent with the facts in the record.  The only customer account
that was affected by Plaintiff's 2017 leave was Liberty
Construction, and Plaintiff himself asserts that "Liberty
Construction requested [Plaintiff's temporary replacement] remain
on the account because its business was growing and there was a
thought that [Plaintiff] and [the temporary replacement] could
partner together on the account."  Dkt. 61 ¶ 11.  Plaintiff
therefore does not argue that the assignment of Liberty
Construction to a second account manager was discriminatory or
retaliatory.  I therefore allow Defendants' motion as to all claims
stemming from Plaintiff's 2017 leave.

**III.** **Claims of Discrimination and Retaliation Resulting from the 2018 Leave Period**

The parties further dispute whether Plaintiff has made out a
prima facie case of discrimination and retaliation resulting from
the 2018 leave period.

**A.** **Discrimination**

The Court assesses Plaintiff's claims of discrimination under
the ADA and Massachusetts General Laws chapter 151B using the
burden-shifting paradigm set forth in McDonnell Douglas Corp. v.
Green, 411 U.S. 792 (1973).  See Tobin v. Liberty Mut. Ins. Co.,
433 F.3d 100, 104 (1st Cir. 2005) (applying the McDonnell Douglas

framework to claims under the ADA and Chapter 151B).  Under the McDonnell Douglas framework, Plaintiff bears the initial burden to "make a prima facie case of discrimination." Sensing, 575 F.3d at 154.  To make such a case, Plaintiff must show "'(1) that [he] suffers from a disability or handicap'; (2) that '[he] was nevertheless able to perform the essential functions of [his] job, either with or without reasonable accommodation,' and (3) that [his] employer 'took an adverse employment action against [him] because of, in whole or in part, [his] protected disability.'" Id. (quoting Carroll v. Xerox Corp., 294 F.3d 231, 237 (1st Cir. 2002)).  If Plaintiff makes the requisite showing, the burden shifts to the employer to "to articulate a legitimate, non-discriminatory reason for their employment decision and to produce credible evidence to show that the reason advanced was the real reason." Id. (cleaned up).  If Defendants proffer a legitimate, nondiscriminatory reason for their action, "the burden shifts back to [Plaintiff] to produce evidence to establish that [Defendants'] non-discriminatory justification is mere pretext, cloaking discriminatory animus." Id. (cleaned up).

Defendants argue that Plaintiff cannot satisfy his prima facie disability discrimination case because he cannot satisfy the third element of the McDonnell Douglass framework—that is, he cannot establish that an adverse employment action was taken against him because of his disability.

15

I begin with the question of whether Plaintiff suffered an adverse employment action. Under federal law, "[a]dverse employment actions include demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees." White v. New Hampshire Dep't of Corr., 221 F.3d 254, 262 (1st Cir. 2000) (citation omitted); see also Sensing, 575 F.3d at 157 (explaining that an adverse employment action under Chapter 151B includes any "material disadvantage in respect to salary, grade, or other objective terms and conditions of employment") (cleaned up). The First Circuit has noted that "[a] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Morales-Vallellanes v. Potter, 605 F.3d 27, 38 (1st Cir. 2010) (internal quotation marks and citation omitted).

Defendants suggest that Plaintiff cannot demonstrate an adverse employment action because Plaintiff was never terminated from his employment. However, I determine that the reassignment of Plaintiff's accounts could constitute an adverse action within the disability-discrimination framework. Notably, Plaintiff asserts that his "compensation would have been even greater had he not been stripped of two of his largest accounts immediately upon returning from leave." See Dkt. 61 at 6. According to Plaintiff, therefore, the reassignment of the accounts after his 2018 leave

of absence was effectively a demotion that materially impacted his pay.  Although Defendants argue that Plaintiff's assertions are too speculative, they have not provided any evidence to contradict them. Defendants' argument that Plaintiff suffered no adverse employment action as a result of his leave-taking in 2018 are therefore unavailing at this stage in the proceedings.

I note that Plaintiff makes several additional arguments regarding "adverse employment actions" in 2018 that appear to be more minor in nature.  He argues, for instance, that he was paid commissions while on leave in 2017 but that he was not paid his commissions in full while on leave in 2018.  Defendants appear to have owed Plaintiff no compensation for commissions during the time that he was on leave, however, and the lump sum that they paid Plaintiff after his return from leave in 2017 appears to have been discretionary.  Likewise, Plaintiff argues that Defendants took too long to get him a new company cellphone and gas card.  But the replacement phone appears to have been ordered in a reasonable amount of time (it was shipped 12 days after Plaintiff returned from work) and Plaintiff was able to expense the cost of gas while waiting for his new company gas card.  Plaintiff further argues that he did not have access to his customer list after returning from leave, but he has not articulated how this minor frustration impacted his ability to work.  Finally, the so-called "audit" of Plaintiff's expense report appears to have been an

automated process that occurred as a result of the Concur system, and in any case the audit does not appear to have impaired Plaintiff's ability to work. These incidents are "mere inconvenience[s]" and cannot sustain his discrimination or retaliation claims. See Morales-Vallellanes, 605 F.3d at 38 (quoting Marrero v. Goya of P.R., Inc., 304 F.3d 7, 23 (1st Cir. 2002)).

Defendants next assert that Plaintiff cannot show that the reassignment of his accounts after his leave of absence was "because of" his disability. See Sensing, 575 F.3d at 154 (cleaned up). On the one hand, Defendants point to evidence that Plaintiff's customers complained that Plaintiff was unreliable and unresponsive. Although Plaintiff attempts to muddy the waters by suggesting that the customers became frustrated with his response time only after he went on leave, at least one of the customers, Turner Brothers Construction, appears to have expressed discontent with Plaintiff's performance from the beginning. Others found that they preferred working with Plaintiff's temporary replacements and requested to continue working with them permanently. When Defendants attempted to negotiate for Plaintiff to stay on the accounts, the customers declined.

On the other hand, Plaintiff points to some evidence suggesting that Defendants might have encouraged customers to seek out new account managers. Most notably, he cites the sworn

affidavit from the representative of Liberty Construction stating that HD Supply's employees communicated that Plaintiff might not return from his medical leave or would return at reduced capacity. Although Plaintiff does not point to testimony showing that representatives from the accounts that were reassigned received similar communications from Defendants, the affidavit nevertheless provides some evidence that Defendants induced the customers to discontinue their relationships with Plaintiff. In the balance, and viewing the facts in the light most favorable to Plaintiff, I find that Plaintiff has provided sufficient evidence to show that an adverse employment action was taken because of his disability.

**B.   Retaliation**

"To establish a prima facie case of retaliation, Plaintiff must show that (1) [he] undertook protected conduct; (2) [he] suffered an adverse employment action, and (3) the two were causally linked." Cherkaoui v. City of Quincy, 877 F.3d 14, 28 (1st Cir. 2017) (internal quotation marks and citation omitted). For retaliation claims, "a plaintiff may satisfy [the adverse-employment-action] requirement by showing that a reasonable employee would have found the challenged action materially adverse." Morales-Vallellanes, 605 F.3d at 36 (cleaned up). "This is an objective test and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Id. (cleaned up).

Defendants argue that, for the same reasons discussed above, Plaintiff's retaliation claims cannot survive the burden-shifting framework.  On the same basis as the discrimination claims, I deny Defendants' motion with regard to retaliation claims stemming from the 2018 leave period.

## IV.   Claims of Discrimination and Retaliation under the ADA and Chapter 151B Resulting from Plaintiff's 2019 Leave Period

I next turn to Plaintiff's claims stemming from the more significant period of leave that he took in 2019.  Defendants argue that Plaintiff failed to exhaust state and federal administrative remedies for ADA and Chapter 151B claims after September 27, 2018 because he did not update his charges before the Equal Employment Opportunity Commission ("EEOC") and the Massachusetts Commission Against Discrimination ("MCAD"), which were filed on that date. Plaintiff contends that any events occurring after September 27, 2018 would be included in the scope of the investigation of the charges before MCAD and the EEOC and are therefore administratively exhausted.

"Individuals asserting discrimination or failure to accommodate claims under the ADA are required to file an administrative charge with the EEOC, or alternatively, with an appropriate state or local agency, prior to commencing a civil action."  Flaherty v. Entergy Nuclear Operations, Inc., 946 F.3d 41, 55–56 (1st Cir. 2019).  The "charge 'shall be filed' with the

EEOC 'within one hundred and eighty days after the alleged unlawful employment practice occurred,' or within 300 days if 'the person aggrieved has initially instituted proceedings with [an authorized] State or local agency.'" Bonilla v. Muebles J.J. Alvarez, Inc., 194 F.3d 275, 278 (1st Cir. 1999) (quoting 42 U.S.C. § 2000e-5(e)) (alteration in the original).  Likewise, "[u]nder Massachusetts law, a plaintiff alleging employment discrimination must file a complaint with the MCAD prior to bringing a civil action."  Preston v. Second Wind, Inc., 824 F. Supp. 2d 247, 250 (D. Mass. 2011).

For charges before the EEOC, "[t]he scope of the civil complaint is . . . limited to the charge filed with the EEOC and the investigation which can reasonably be expected to grow out of that charge."  Fantini v. Salem State Coll., 557 F.3d 22, 26-27 (1st Cir. 2009) (quoting Powers v. Grinnell Corp., 915 F.2d 34, 37 (1st Cir. 1990)).  "[T]he critical question is whether the claims set forth in the civil complaint come within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."  Id. at 27 (quoting Powers, 915 F.3d at 37).

For charges before the MCAD, the "scope-of-the-investigation" rule provides that "a claim that is not explicitly stated in the administrative complaint may be asserted in the subsequent . . . [civil] action so long as it is based on the acts of discrimination

that the MCAD investigation could reasonably be expected to uncover." Pelletier v. Town of Somerset, 939 N.E.2d 717, 727 (Mass. 2010) (quoting Everett v. 357 Corp., 904 N.E.2d 733, 748 (Mass. 2009)). Under this rule, "the exact wording of the charge of discrimination need not presage with literary exactitude the judicial pleadings which may follow." Davis v. Lucent Techs., Inc., 251 F.3d 227, 233 (1st Cir. 2001) (citation omitted). "Plaintiffs have been allowed to allege a claim in a complaint where the factual statement in the written charge should have alerted the agency to an alternative basis of discrimination, and should have been investigated regardless of whether it was actually investigated." Id. (cleaned up) "Simply stated, the scope of the investigation rule permits a district court to look beyond the four corners of the underlying administrative charge to consider collateral and alternative bases or acts that would have been uncovered in a reasonable investigation." Thornton v. United Parcel Serv., Inc., 587 F.3d 27, 32 (1st Cir. 2009).

Plaintiff has failed to show that his claims of retaliation and discrimination under the ADA and Chapter 151B resulting from his 2019 leave period would have fallen within the scope of the MCAD investigation or could reasonably have been expected to grow out of the charges before the EEOC. I reach this conclusion for the simple reason that Plaintiff's leave of absence in 2019 occurred after the MCAD and EEOC investigations had closed. The

MCAD dismissed Plaintiff's case on March 8, 2019 and the EEOC dismissed his case on March 28, 2019.  Plaintiff's 2019 leave period began on April 24, 2019.  As the Massachusetts Supreme Judicial Court explained, "it is a stretch to describe acts that occurred after the agency's investigation has ended as within the scope of the agency investigation." Everett, 904 N.E.2d at 749 (cleaned up).  Plaintiff has not explained how the agencies could have discovered the alleged evidence of discrimination that occurred after the investigations were closed.  I therefore find that the ADA and Chapter 151B claims related to Plaintiff's 2019 leave period were not administratively exhausted.[1]

## V.   **Claims Based on the FMLA**

Defendants next argue that Plaintiff's FMLA retaliation claims fail for a variety of reasons.[2] The First Circuit has held that "an employee is not entitled to reinstatement under the FMLA if he is unable to return to work until after the expiration of his leave." Bellone v. Southwick-Tolland Reg'l Sch. Dist., 748

---

[1] In any event, Plaintiff's ADA and Chapter 151B claims based on his 2019 leave would have presented a close call because of Plaintiff's open-ended leave-taking.  However, the Court does not need to resolve this question because Plaintiff's claims were not exhausted.

[2] Defendants argue, for instance, that any claims by Plaintiff after April 3, 2019 are time-barred by the FMLA's two-year statute of limitations.  See 29 U.S.C. § 2617. Because I conclude that Plaintiff's FMLA claims based on his 2019 leave of absence fail for alternate reasons, I decline to consider Defendant's affirmative defense here.

F.3d 418, 424 (1st Cir. 2014).  Because the FMLA provides for only 12 workweeks of leave during any 12-month period, Plaintiff's leave of absence in 2019 well exceeded his entitlement under the FMLA. See 29 U.S.C. § 2612(a)(1).  He therefore fails to show any adverse action under the FMLA stemming from his 2019 leave.  For the reasons discussed above, however, I conclude that Plaintiff's FMLA claims based on his 2018 leave of absence may proceed.

## VI.   Plaintiff's ADA Hostile Work Environment Claim

Defendants argue that Plaintiff has failed to prove his hostile-work-environment claim.  In order to state a claim for a hostile work environment, Plaintiff must "demonstrate that the complained-of conduct was so severe or pervasive that it altered the terms of [his] employment."  See Carmona-Rivera v. Puerto Rico, 464 F.3d 14, 19 (1st Cir. 2006) (cleaned up).  "There is no mathematically precise test we can use to determine when this burden has been met."  Id. (cleaned up).  Instead, the Court must "evaluate the allegations and all the circumstances, considering the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance."  Id. (cleaned up).

"The harassment must be objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."

Noviello v. City of Bos., 398 F.3d 76, 92 (1st Cir. 2005) (cleaned up).  "[R]udeness or ostracism, standing alone, usually is not enough to support a hostile work environment claim."  Id.  "The anti-discrimination laws were not enacted to create or enforce a general civility code."  Id. (cleaned up).

Viewing the facts in the light most favorable to Plaintiff, the Court does not find that Plaintiff has supported his hostile-work-environment claim.  He argues that Defendants' failure to immediately replace his company cellphone and gas card, their failure to immediately give him his revised customer list, and the so-called "audit" of Plaintiff's expenses were hostile and abusive.  But, for the reasons discussed above, these incidents were mere minor conveniences, and Plaintiff has not shown that they rose to an objectively offensive or unreasonable level so as to constitute a hostile work environment.

Plaintiff also provides some evidence that his illness and his gastrointestinal distress were discussed at work.  In his affidavit, for instance, he explains that Via met with him for lunch in Boston and asked Plaintiff "many detailed questions about [his] medical condition, as well as [his] prognosis."  Dkt. 61-1 ¶ 51.  Plaintiff also attested that Via had shown him an extended crude video.  And he vaguely points to a conversation in which he believed that McNevin insulted his medical condition.  Dkt. 61 ¶ 39.  But although the discussions of Plaintiff's health condition

might have been insensitive or made Plaintiff uncomfortable, Plaintiff has not shown that they were objectively crude or abusive, with the one-off exception of the video shown to him by Via. I therefore allow Defendants' motion for summary judgment on Plaintiff's hostile-work-environment claim.

**ORDER**

For the reasons set forth above, the Court **ALLOWS** in part and **DENIES** in part Defendants' motion (Dkt. 56).

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge